Next matter is Parkinv.US Is this your first time coming here? Yes, it is. Excellent job. A little birdie told me it was your first time. Bond. Where's Bond? Where's Bond? Where's the transcript? I want the transcript. Where is it? All right, never mind. We're on to another case. Good morning, Your Honors. Good morning. Darren Gelber, G-E-L-B-E-R, on behalf of Harry Parkin, the appellant. Let me ask you something that bothers me. Maybe you can help me out with this. Let's assume that you're right on getting past the procedural default because of the actual innocence claim. Why doesn't the actual innocence assertion only go to the 12 mail fraud accounts? I think you'd agree that it really does only go to the 12 mail fraud accounts. You're not claiming actual innocence on account 13. If that's true, why isn't the spillover argument waived? Because the spillover goes to the count that you're not challenging it, and you couldn't really challenge it. Your Honor, the argument with regard to count 13 has always been that this deluge or avalanche of skilling prohibited evidence on counts 1 through 12 truly tarnished any jury's ability to evaluate the case. No, I understand that. But on direct appeals, I understand that. You argued generally that your mail fraud conviction was bad. It sounds like a sufficiency of the evidence argument. But you didn't combine with that, and correct me if I'm wrong, that the convictions, the evidence that was committed on those 12 counts improperly tainted the jury's consideration under count 13. So if you didn't raise spillover on direct appeal, and you have to show cause in prejudice or actual innocence now to raise this on habeas, then it seems to be problematic not as to the 12 counts of mail fraud, but as to the 13th count of extortion because that's where the spillover is, and why isn't that waived? I understand perfectly the Court's query, and it's the one that has caused me to stay up at nights. How am I going to answer this very question? What did you come up with? The answer is actually simple. The district court found that we had not stated an ineffective assistance claim with regard to counts 1 through 12, or for count 13 for that matter. That was a finding that I don't believe respectfully the district court was entitled to make on this cold paper record because the district court assumed without any evidence at all that appellate counsel on the direct appeal had made a strategic decision not to pursue a skilling-based claim for counts 1 through 12 or the spillover. I don't understand that at all. I don't know how you could make a strategic claim to abandon a constitutional argument for which there's no risk. I don't get that. Which other people have made in other cases. So forget that. Let's assume that the strategic claim, which kind of, that's weird. Let's assume that that's not very persuasive. So you still have to get to ineffective assistance of counsel to get us to spill over on count 13, and as Judge Sloder just said, other people had made that claim. When skilling made the claim, it was percolating around in the circuits. There was an issue about this incredible overuse of theft of defrauding of honest services. Whether or not that was valid or constitutionally vague. So the claim was available to you. Why isn't that just basic ineffective assistance of counsel that doesn't meet the burden of ineffective assistance of counsel because you can't say it was ineffective. Or waiver. Your Honor, I was about to hone in on the step two, and that is I submit that it was constitutionally ineffective assistance not to raise a skilling claim on direct appeal. And a corollary to that would have been and should have been the spillover prejudice to count 13. Well, you're right. If that's ineffective, then you're home free on count 13. I'm just not sure that's Strickland ineffectiveness as to ineffectiveness on the skilling shelves. I don't know. It's a good argument. It's a good argument. It's the only one you have. It's a good argument. Well, I submit that Parkin. He thinks he has more. In his own bumbling pro se way, Parkin articulated a skilling challenge during his trial. He didn't say skilling. He didn't say void for vagueness, but he kept objecting to testimony, to evidentiary rulings. On what grounds? To jury instructions that him pursuing his own undisclosed and secret self financial interest in these companies without more couldn't meet the definition of the honest services fraud. He repeated that objection over and over again. And you see the district court and even the government recognizing the type of argument he was making in their responses and in the district court's ruling because the district court repeatedly would ask the government, is this a case about bribe or kickbacks? And the government would say, no, we don't even think this case is about bribe or kickbacks. Until they wrote the brief. I'm sorry? Until they wrote the brief on appeal. Yes. And so the government's brief here and before the district court is really an attempt at retrofitting, I call it, or fitting the square peg of the trial evidence into the round hole that skilling left on the honest services fraud because this case reeks of skilling. It reeks from the indictment to the opening to the manner in which the evidence was presented at trial. It reeks at sentencing. The judge specifically asked at sidebar. The judge stated at one point, because I guess your client made an objection that they were trying to put, I don't think he used the term bribery, but I think at one point he did use the term bribery, not kickback. And the judge then recounted what he thought it was about. And said, let me find it. And the assistant U.S. attorney agreed that that was correct, that that was not what they were arguing. And that they were not arguing was the very thing that after skilling they would have had to argue to get a mail fraud conviction. That's right. And even at sentencing, Parkin is saying, use the guideline that involves thefts. And the government is saying, no, we're going to use the guideline that applies to intangible rights. The government is saying, sentence Mr. Parkin, not based on theft of money or property, which we hopefully could identify some value to, but sentence him under the intangible loss of the right to honest services. And the count 13 argument, Your Honor, is as follows. Either Parkin sufficiently raised the issue so that it's preserved, and the district court on the habeas 2255 action erred in just not considering it. Or if he didn't sufficiently raise it below or on appeal, on direct appeal, it was due to his ineffective assistance of his appellate counsel. Because the district court recognized that there's a certain procedural tension on the one hand. I don't even see that you have an ineffective assistance of counsel plan here. Well, if there was an available skilling claim, the district court found that there was a skilling-like claim readily packaged in a bow that appellate counsel could have made. Yeah, but you don't raise that. Oh, we raise ineffective assistance of counsel. We've raised that below. We did raise that below. And the district court's opinion passes upon. Did you brief it? I'm sorry? Did you brief it here? Well, I briefed the district court's order that we're appealing, where the district court wouldn't even consider the arguments. The district court focused erroneously in our view. Let me ask you another question. What about the concurrent sentencing doctrine? Is it alive, and should we consider it? I don't think it's alive. Why not? This is not a direct appeal. It's not a direct appeal, and perhaps this court would be writing on a clean slate about the availability of the concurrent sentence doctrine. Why should we do that? That's such a good doctrine. A good way out. That's right. Well, because Parkin was And we have never said that there's no such doctrine, and the Supreme Court moved back from it, but it has never said there's no such doctrine. Well, the district court didn't even mention that doctrine. That was first raised by the government in its brief on appeal. The district court didn't even cite the concurrent They didn't label it that, but that's what they said. And the government never raised it below. No, they didn't call it concurrent, but that was a basis for their decision. Yes. So how can you say they didn't raise it? Well, the district court, sua sponte, used that as a basis to dismiss the petition below, without notice to us or an opportunity to brief the issue. All of a sudden, we got an opinion that That's the decision you're appealing from. Yes. So you just can't ignore it. You want to ignore it. It's one thing to say we shouldn't apply it, but the government says it's still valid. My question to you is why shouldn't we consider it? Well, I think you have to consider it, and I hope the court doesn't think that I didn't brief it. I did brief the issue of the availability of the concurrent sentence doctrine here, and it's ill-suited, respectfully, to address a claim of a constitutional deprivation of rights that you stand convicted of 12 counts and all the collateral consequences that go with a criminal conviction, especially to Parkin, who was an attorney, and say that we're not going to even address that you were convicted of 12 counts under a theory that the law doesn't even recognize is valid just because you were convicted of another count, that we're going to just treat that as the overwhelming guidepost by which to judge your entire conviction. Even if Parkin still remains, after all is said and done, even if Parkin still stands convicted of count 13, I suggest that this court and the law owes to Mr. Parkin, someone to consider his claims as the counts 1 through 12, that they were unconstitutionally obtained. You know, there's the mandatory assessment issue, which courts have relied upon to say that he's entitled to some relief, even if it means the refunding of mandatory assessments. But the fact that you're convicted of 12 separate counts of honest services fraud when... Yeah, but that's not before us on a 2255, is it? Well, the entirety of the conviction, you know, the entirety of the sentence. Answer the question. Under a 2255, which you're appealing from, the assessments are not before us. We certainly didn't bring this action to attack those mandatory assessments. I know you didn't. So don't use the assessments to try to bootstrap your argument. Well, the court, I think, Your Honor, I think the courts have relied upon the mandatory assessments in other contexts as a sufficient basis for the court to consider claims, albeit on direct appeal. Oh, all right. Judges, I think it would be a terrible injustice to Mr. Parkin to sweep his arguments about counts 1 through 12, which I think are really substantial. I think someone sometime ought to address his arguments with regard to counts 1 through 12, but to just ignore those under this concept of concurrent sentence doctrine, a doctrine that you'd have to blow the dust off to invoke here. No, that's not so. I think that courts have used the concurrent sentence doctrine. I don't think you'd blow the dust off of it. Some of us might like it. It's convenient, as Judge McKee said. It certainly provided an easy way for the district court to dispose of Mr. Parkin's claims. So it did. If you're a district judge, that's not a bad thing to do. For Mr. Parkin, it was a bad thing. It sure was. I just hope that when someone raises a constitutional claim that has some teeth to it, whether you agree with it or not at the end, you can't say that this is a frivolous claim. I mean, this whole case, as I said, reeks of evidence and a theory prohibited by skilling, and respectfully, somebody ought to consider that at some point in time. The court's decision to use what it didn't say was the concurrent sentence doctrine, but we all recognize was the concurrent sentence doctrine, as I said, was something that had not been advocated by the government. It was first disclosed in the district court's opinion, and there's some part of me that says the district court should have alerted the parties it was considering deciding the case on that basis, but it didn't. Well, why sentence when there's a district judge? I mean, I was never a district judge. Judge McKee was. I was not. Well, we were never. You've got three newbies up here. Well, the parties, the petition was obviously presented in the following fashion to the district court. Counts 1 through 12 have to go because of skilling. There's no way they could be saved in light of skilling, and the overwhelming prejudice caused by the evidence on those counts completely tainted any ability for the jury to consider count 13. Well, why do you say that? I'm sorry? That's the spillover effect. Yes. Yeah, well, what is the spillover effect? Your Honor, because of the skilling theory of the case, the government was repeatedly permitted to offer evidence of ethical lapses of . . . There were a lot of them, weren't there? Yes, and all admissible under the then-prevailing wisdom of the honest services fraud, of ethical lapses, of lying on financial disclosure forms, of breaching the public trust, parking was cross-examined extensively on those . . . He did all those bad things. And all admissible before the jury because the honest services fraud statute in effect at the time permitted it. Today, if this case were retried today, I suggest that 85 or 90 percent of that evidence does not come in on the trial of count 13. My point is, focusing in on that, assuming we can get this spillover, what 85 to 90 percent is it? It seems to me the dealings with regard to the airport contract, to the things that were done to try to enable Abdallah to buy out . . . I never can pronounce that name. Firmundo, is that it? Fiamfreddo. I've been telling my close . . . I call it Frodo. I don't mean it disrespectfully, but it's easier. I call it the F. My mind goes someplace else when I hear that. But to buy out Fiamfreddo, that seems to me clearly would come in. Because you could argue, or a jury could find, that that was the kickback, getting his contract so that Abdallah is in a situation that he can buy out Fiamfreddo and then Parkin can get his one-third interest. So that seems to me to come in. Possibly the demolition contract, because arguably getting the money for those demolition contracts is what allows the debt service to continue on Parkin's loan so he can get his 15 percent interest. That seems to me to be a stretch. But I don't know, a properly instructed jury, maybe they could go there. I don't know. But the rest of it, I do have a problem with how any of the other stuff comes in if those 12 counts are not in the case, if we can get this bill over. Yes. And so, again, I would ask the Court to consider the ineffective assistance claim by not making a skilling-based claim, which in my mind was the best claim that he had on direct appeal. And I don't think the Court can find on the cold record that the decision not to pursue that claim was strategic. I think that would need a hearing in which appellate counsel ought to testify about her thought process in selecting the issues. You're very hard on your colleagues. I don't mean to be. I mean, appellate counsel took the case as she saw it, and I'm sure did the best job she thought she could. But sometimes we make mistakes, and I think not raising a skilling-like claim here was a mistake, and to just cast it away as a strategic decision without evidence to support that I don't think is correct. I don't know if I asked the Court to reserve two or three minutes for rebuttal. I'm not sure. Thank you. Thank you, Mr. Gover. Good morning, Your Honors. on behalf of the government. Were you trial counsel, Mr. Moore-Marco? I was not, actually. Both trial counsel. You are very, very lucky. Both trial counsel have moved on, Your Honor. But I did handle the briefing. I hope you meant moved on to another case. Moved on to bigger and better things. Actually, one of the trial counsel was our now-recently Senator Chiesa, I guess, and his co-counsel is practicing in other capacity as well. My problem here is it's helpful sometimes in reading a brief if you get the feeling that the brief honestly portrays what happened in the record, so if I have a question about what went on, it's answered in the brief. I don't get that feeling at all from your brief. You really take liberties with the record. In the case, the way it's presented in the brief, if I were just to read the brief and not read Mr. Galbraith's brief, I would get the feeling that this was basically an economically-driven fraud in the sense of bribery kickback post-skilling, but that clearly wasn't the case. Trial counsel was asked many times whether or not there was a bribery theory. He said specifically, no, that's not what we're going after. He made it very, very clear that he was going after honest services fraud, which he had every right to do before skilling. But that's not what I get in reading your brief. What you're trying to do is take economic gain and the motive of economic gain, which is always there, and conflate economic gain with the intent necessary to get bribery or kickback. Judge McKee, let me say I'm sorry that you feel that way. And I actually think you are— You feel that way, too. I think you're under a misimpression. Let me go to the record. Yes, he does. That part of the record where he quotes liberally about the government saying, Your Honor, exactly correct. It's not that someone offered him a bribe. Let me put that in context. You just mumbled something that I didn't hear. Let me take it slowly. In context, what was happening at that part where it looks like counsel was conceding that this case didn't involve bribes, Mr. Parkin was making an objection. And it was an objection that the district court itself couldn't understand. And it said to the prosecutor, Can you understand what he's saying? And the prosecutor said, I can't understand it either. But what they gleaned was that Mr. Parkin was arguing that there were two different arguments going on here, one involving bribery and one involving something else. And then let me go exactly to the record. At S.A. Supplemental Headings 989— This is 990. I'm looking at it right now. He was pro se at this point, right? Yes. And so the argument didn't quite make sense to the court. The court says, well, again, the question is are these two different things or are they the same thing? So the court says, well, whether you have an undisclosed interest and you're steering contracts to benefit that undisclosed interest or you're receiving some benefit from an official action, that's two sides of the same coin. And then they go on in the next page, and this is where there's a line left out before the I agree. The court says, I don't think they're the government arguing that there was some sort of bribe separate and distinct from an effort to benefit the undisclosed interest. I don't think they were saying that, you know, somebody came along and offered the dependents some money or benefits. So what they're talking about, and that's where he says, correct, it wasn't separate and distinct from the solicitation of a bribe or the extortion. Now, we never talked about a bribe, but an extortion is solicitation of money. He was trying to get, I mean, this certainly was motivated by, Your Honor, this was all about money. He wanted to get a one-third ownership interest in the company. I mean, if we were to retry this today, and I will candidly concede, and I thought I did in my brief, that the overwhelming majority of the argument went to the honest services fraud. But we also had in the charge a money and property theory. We also had extortion. They were argued to the jury. They were in the instructions, and they were well pled, and a jury could come to that conclusion. But I will concede, you know, before anyone, that 90 percent of the time was talking about honest services. But honest services is what we have here. And I ask the Court to look at, in particular, the Jennings case out of the Eighth Circuit, which I think are these facts about as close as you can possibly come. But Jennings had a very specific quid pro quo, an intense quid pro quo. And quid pro quo was argued, and quid pro quo was on the tapes, Your Honor. And to the airport in the demolition, yes. But the other stuff, I'm not so sure. It's clear it was to the airport that was driving it. And arguably, the demolition contract. And that, as I said to Mr. Kelber, that gets a bit tenuous. But I could see a properly instructed jury saying what was driving the deal behind the demolition contracts, which was a joke. I've never seen anything like it. We put something up to bid four or five times. It keeps going. It keeps going. The more bidder, you pull it back. As we said, if we have to bid this 100 times, you're going to get that contract. You're going to get the last look. But Judge McKee, why isn't that the quintessential case that, in fact, Skilling is talking about? I mean, what Skilling is trying to do is differentiate between somebody who just has a conflict of interest that's undisclosed and maybe shouldn't be making a decision versus somebody who's trying to funnel money into his own pocket. And that's what's going on here. I mean, if you look at the – Well, the key word there is into his own pocket. That's why I say you have that with the airport, maybe with the demolition, with all this other stuff. It just seems so incredibly tenuous to me. Well, look at the overall scheme, though. And it started out – it was a carrot and stick sort of scheme. He wanted – he was looking at this as a potential retirement plan for him. He wasn't sure his boss was going to get reelected. He needed a business to sort of retire on. And so he's steering – he wants to get – This is Jersey. He probably had a good state pension, actually. I'm just guessing. The record doesn't reflect that, Your Honor. But clearly, he's trying to get a substantial business interested in what he considers to be a very lucrative business. They have a multimillion-dollar contract with the – they have a multimillion-dollar contract, and he wants a third of that. And everything he does is a step to get one-third of that interest. So he's steering – I mean, originally, they just drew up a contract, and he was going to pay a certain amount of money. But it turned out that didn't work out for them. Either they didn't have the money or it just didn't work. So he said, well, the new way he's going to do it is he's going to start steering money to the person that he wants to get the one-third interest from. So he gives them these demolition contracts on Broad and Furman Street. Then he offers them that $1.4 million. But he says there, this is contingent on my getting the ownership interest. But I think it's almost implicit on everything that's happening that this is being done so that he can get his property interest. And that's what – Wasn't Abdallah specifically asked about the quid pro quo? And he could argue the jury could reject that evidence. Yeah. Abdallah specifically said, no, there wasn't any agreement. Let's be serious about that, Judge McKee. I mean, Abdallah doesn't understand the legal distinction that I think we understand, which is that he never offered anything to Parkin. But Parkin was extorting him. He was the extortion victim. So in his mind, he's not thinking – when he thinks bribe, he's thinking, I gave him a pile of cash. And he never gave him a pile of cash. I mean, I think – Gave him a pile of equity. Yeah, well, he never actually got it. Unfortunately, everything here is charged as an attempt. The scheme never quite worked out for anyone. The airport contract didn't go through. He never got his one-third interest. The Amafreto brothers came in and screwed up the plan. There's a lot of stuff that went wrong here. But what we know is this is not a plan that's just about a public official who, you know, didn't dot his I's and cross his T's and fill out a form. What I think the jury clearly saw is a public official who is – and I'm just going to say it again – trying to line his own pockets in whatever way he can by steering public contracts. And I think that's what the Supreme Court meant should be – I mean, if we were to try this case again – I mean, I don't think we would because he's already out of jail and has served his entire sentence, which brings back the concurrent sentence doctrine. But if we were to try this case again, we would try to bring in – I think we'd be entitled to bring in every single bit of information that we got here because it was all one scheme. And you saw that's how it was argued in closing. It wasn't sort of – you know, it was – You mean seriatim. Yeah. I mean, it was just – it was a progression of how to get that one-third interest. But that was always the goal. It was never anything else. And that's the property interest that we alleged from the beginning. Well, I guess the question then is, is the concept of kickback broad enough to include that one-third interest, which is different, I think, than the question of getting the airport contract form. And in Skilling, the court gives a definition – it cites a definition of kickback, which is singularly unhelpful. It's in section 51, and it's basically – And they go back to McNally, which wasn't terribly helpful, and they said that was the quintessential case as well. Right. And so we're left with what is a kickback for Skilling. But that's what I'm saying. I think we need to differentiate between those cases where it's merely an undisclosed interest and there's a conflict of interest and you shouldn't have been deciding that because you had an interest there, versus something where there really is – the aim of the scheme is to control property. Well, but it's got to be more than controlling property. To get a bribe seems to be easy. Kickback is what I'm wrestling with. And it's got to be more than an intent to control property. And that's why the definition that is cited in Skilling is just really – it's a wild area. Well, I guess what I'm suggesting is, even if you don't consider the Broad and Furman Street demolition contracts to be the extortion or the bribe or the kickback, it's certainly relevant evidence to show what is in fact the bribe and the kickback. It's hard to explain this story of what's going on without showing the progression throughout. You could just introduce evidence of the airport contract by itself, and that would give you everything you need for a separate – aside from the extortion that arises out of it. It would also give you everything you need to allow the jury to consider whether or not there's a kickback issue there, such as to constitute no fraud, without any of this other stuff. Well, if you don't have the undisclosed interest, then you don't understand why it is he's trying to – at least part of why he's trying to get this money to Abdallah. Certainly that explains, in the early stages, he's worried that when the Fiamma-Freddos come in, he's not going to get his money back because they're now partial owners, and they weren't part of the deal that he had made, and so there's a problem there for them. What about the concurrent sentencing doctrine? I'm glad you asked it, Richard. I'm a big fan now of the concurrent sentencing doctrine. You like it now, even though you didn't like it or you didn't even know about it? Yeah, well, you know, I happen to have been in that group of people who thought that it had died when the special assessments came in, and I hadn't considered, as the Seventh Circuit properly did in Ryan and as Judge Irenas properly did – It pops up wherever you're going. It helps you and you don't find it. It's properly versus merely. Those are the two contrasting adverbs. If it helps you, it's properly. Well, I think the Seventh Circuit in Ryan is a well-reasoned case that this Court should follow. No, no, I don't – Ryan doesn't – I don't see that it helps that much because there, even aside from all the stuff that fell off the scale, you've still got two valid prerogative acts to get you to RICO. Right. And the analysis is really going to whether we have the predicates for the RICO is not going to the kind of concern that we have here under the mail fraud inquiry. Well, Your Honor – Because you had bribes. You had two mail frauds consisting of bribes. Yeah. Therefore, the RICO was okay. Yeah. I guess if you're accepting the premise that the special assessments are irrelevant, then I don't need Ryan for that. I think Ryan establishes that you can't rely on special assessments standing alone. On the concurrent sentence doctrine, other than that, I think it's just – you've got what I consider being a rock-solid extortion conviction for which he received a 90-month sentence, and you've got these other convictions for which he received a 60-month sentence that he wants to challenge. But if there's nothing this Court can do to help him on that issue, why are we wasting scarce judicial resources? Well, Mr. Gilbert's response is going to be discourage judicial resources for exactly what the taxpayers expect of a court in vindicating someone who's been convicted of 12 counts unconstitutionally. That's our job. Well, Your Honor, if this were direct appeal, I would perhaps share that view. But we're on 2255, which the Supreme Court has told us is a very unusual remedy that's only to protect against manifest injustice. And, you know, the manifest injustice here is just less clear because – Well, from Harkin's standpoint, it is manifest injustice. Well, I mean, he's already served the entire term, so it would be a pyrrhic victory here. Yeah, but the courts talk about other things, collateral consequences, reputation. I mean, his reputation is pretty much shot anyhow, I would imagine. He's a lawyer. There are no collateral consequences alleged in the moving papers here. Yeah, that's what I have heard. Yeah, I mean, there's just nothing that he's going to suffer. He's not going to get his pension back if those 12 counts, you know, are – assuming he lost a pension, he's not going to get his voting rights back. There's nothing he's going to get back. There's no relief this court can really give him. And, frankly, one of the things that the court is entitled – it's a discretionary doctrine. So Judge Irenas could have reached it if he chose to. But I think one of the things that I assume this court is taking into account and I think Judge Irenas is taking into account is we're living in a sequester world where, you know – seriously, public defenders who are representing people today are on furlough. So, you know, when the court has to decide how to spend its scarce judicial resources, do we want to spend it examining a case that's going to have no practical effect and appoint an attorney? I mean, this case, unfortunately – and it's no one's fault, but this case has gone on for several years. It's been through four district court judges. Again, no one's fault. But is this something, as a matter of discretion, that the court wants to be spending its money on in this – You know, there's something about an unconstitutional conviction that strikes me as something other than de minimis. I know Mr. Galbraith doesn't have time left for rebuttal, but talking about 12 – the jury's convicting someone of doing 12 separate things that they said were felonies. And it turns out they're not great and they're unethical, but they're not federal crimes. And these are not the crimes that were charged and probably not any crime at all. A court pronunciation of that fact, that does seem to me to be kind of the gist of what we hear from you. Well, I was trying to put your mind at ease. You're trying to give us a wham. Well, I was trying to put your mind at ease by arguing that in the alternative, those convictions are solid, that we could, in fact, get convictions on them under a money or bribery theory. I'm not going to have a lot of luck seducing my mind on that one. Okay. Again, I think I've made it clear, except for the airport deal, which is seemingly pretty clear, and maybe the demolition contract. The other stuff, I'm just – But why – judge, if those are solid, why do you need any of the rest? I mean, that makes a valid – I'm not supposed to be asking you questions. I'm sorry. That's all right. But my point is that once – Wait a second. Can I answer the question? Yes, you may, Your Honor. It's not a question of need. It's just that I was going through the spillover argument, and I was saying that in relation to the spillover argument. But, again, maybe it's just a visceral reaction, and I haven't thought it through very carefully. If there is a situation where someone has been convicted of something which at the time was a crime, and the court said that conviction is unconstitutional, I just – something pulls against my fabric for us to simply say, well, we'll leave it alone because there's nothing we can do about it anyway other than to pronounce the fact that the convictions are unconstitutional. Well, actual innocence is important, Your Honor. I don't think they have it here for the reasons we've already discussed. But I also think that the concurrent sentence doctrine recognizes that the court should invest its resources where they're best used and will actually make a difference. You raised in a 28-J letter U.S. v. Tyler. I did. All right. But on the actual innocence question, which is the dicta that you were writing about in your letter, this isn't really a Tyler case in your viewpoint, is it? Because you have two remaining doctrines, both of which are supportable. Yeah, you don't need to reach that issue. Which is in Tyler, you had one that was and one that wasn't, and the language which you said is dicta may be more than dicta, but which you said is dicta says if one's unsupportable, the district court has to grant a new trial. In your opinion, that's not this case. That's correct, Your Honor. We do think Tyler. Well, I'm not going to go into Tyler. Not right now. Okay. Thank you, Your Honor. Mr. Monarmarco, am I saying that correctly? Monarmarco, yes, Your Honor. Thank you very much again. Very fine argument. We're in a roll here. Mr. Galbraith, very fine argument. Thank you very much. Thank you, Your Honor. We'll take them under advisement.